RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0114p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JOSHUA JOSEPH TACKETT,

*Petitioner-Appellant,*

*v.*

No. 19-1037

TONY TRIERWEILER, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-15637—Denise Page Hood, Chief District Judge.

Argued: February 5, 2020

Decided and Filed: April 15, 2020

Before: GILMAN, McKEAGUE, and KETHLEDGE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Laura Kathleen Sutton, Manchester, Michigan, for Appellant. Rebecca A. Berels, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Laura Kathleen Sutton, Manchester, Michigan, for Appellant. Rebecca A. Berels, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

RONALD LEE GILMAN, Circuit Judge. In July 2006, a drive-by shooting took place in Ypsilanti, Michigan, during which two people inside a trailer were killed. Four individuals, including Joshua Joseph Tackett, were charged with murder in connection with the killings.

Tackett was tried before a Michigan state-court jury and was found guilty on two counts of first-degree murder and on two counts of possessing a firearm during the commission of a felony. He was sentenced to life imprisonment without parole for the first-degree murder convictions.

After going through various state-court proceedings and being denied relief at each stage, Tackett filed a petition for a writ of habeas corpus in federal court. He raised a number of claims, including, most notably, that the evidence in his case was insufficient to support his first-degree murder convictions. The district court denied Tackett's petition. On appeal, five claims are before us, including the sufficiency-of-the-evidence claim. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

**A.      Factual background**

The shooting in this case occurred at a mobile-home trailer belonging to Clint Ousley at approximately 11:30 p.m. on the night of July 9, 2006. Two teenagers were killed: Scott Bonar, who was 17 years old at the time, and Krilissa Feldman, who was 14.

On the day of the shooting, there were two confrontations at Ousley's trailer. The first incident took place that afternoon when one of Tackett's codefendants, Sarah Sykes, along with a group of individuals including the two other codefendants (Paul Copas and Tony Tard), drove in Copas's van to Ousley's trailer. Tackett was not present for this incident. The district court summarized what happened there as follows:

> Copas confronted Ousley outside Ousley's trailer and called Ousley a bitch; he also made a motion like he was cocking a gun. Ousley picked up a baseball bat and called for help from two of his friends who were inside his trailer. Ousley and his friends then argued with Copas and Tard for a few minutes. Copas and Tard retreated soon afterward and jumped back in their van. As they drove away, Ousley threw a crowbar into the rear side window of the van and knocked out the window.

This confrontation was apparently triggered by the fact that Ousley had previously dated Sykes.

After the initial altercation at Ousley's trailer, Tackett joined Copas and Tard. The Michigan Court of Appeals described what happened next during the second incident that took place later that night:

> The group left the house with two assault rifles, picked up codefendant Sykes and others, and traveled from Ecorse to Ousley's trailer home in Ypsilanti. When they were near Ousley's trailer, codefendant Tard stopped at a gas station and covered the license plate, and defendant Tackett moved from the passenger seat to the rear of the van near the broken window. Defendant Tackett put on gloves and supplied gloves or socks for the others. Codefendant Sykes continued to the trailer park. The van pulled over and waited until a patrol car left the area. As they waited, codefendant Tard said, "let's shoot up the trailer," and defendant Tackett "[went] along with him." After the patrol car left the area, the van continued to Ousley's trailer and the three men put on hooded sweatshirts. There was evidence that defendant Tackett shot or attempted to shoot a handgun while his codefendants fired assault rifles into Ousley's trailer. After the shooting, the group drove back to Ecorse where defendant Tackett attempted to hide the assault rifles in his father's garage.

*People v. Copas*, Nos. 277240 & 277549, 2008 WL 4149002, at *9 (Mich. Ct. App. Sept. 9, 2008) (per curiam).

**B.     Procedural background**

Tackett and Copas were tried jointly, but before separate juries, in the Washtenaw County Circuit Court. In January 2007, both Tackett and Copas were found guilty on two counts of first-degree murder and on two counts of possessing a firearm during the commission of a felony. Tackett moved for a new trial and for a judgment notwithstanding the verdict. The trial court denied both motions. Afterwards, he and Copas were each sentenced to life imprisonment without parole for the first-degree murder convictions, to be served consecutive to two concurrent two-year terms of imprisonment for the felony-firearm convictions.

The other two defendants, Sykes and Tard, pleaded guilty to two counts of "open murder" and to two counts of possessing a firearm during the commission of a felony. Michigan's "open murder" statute, Mich. Comp. Laws § 750.318, "establishes a procedure for determining the degree of murder when the information does not charge the defendant with a specific degree of murder." *People v. Watkins*, 634 N.W.2d 370, 376 (Mich. Ct. App. 2001).

When a person charged with murder in Michigan is convicted by a jury, the jury is required to determine whether it is first-degree or second-degree murder. In contrast, "when a defendant is 'convicted by confession,' the court must 'proceed by examination of witnesses to determine the degree of the crime' and 'render judgment accordingly.'" *Id.* (quoting Mich. Comp. Laws § 750.318). The trial judge in Sykes's and Tard's cases, who was the same state-court judge who presided over Tackett's trial, held a "degree hearing" for Sykes and Tard and found both of them guilty of second-degree murder. They were each sentenced to life imprisonment with the possibility of parole for the murder convictions, plus two years for the felony-firearm offenses.

Tackett appealed his convictions to the Michigan Court of Appeals. That court consolidated Tackett's and Copas's appeals and affirmed the trial court's judgment. *Copas*, 2008 WL 4149002, at *1. Tackett next filed an application for leave to appeal to the Michigan Supreme Court. That Court, in turn, denied his motion, writing that it was "not persuaded that the questions presented should be reviewed by this Court." *People v. Tackett*, 759 N.W.2d 207, 207 (Mich. 2009) (mem.).

Tackett subsequently filed a motion for relief from judgment, raising a number of distinct claims. Of particular note, Tackett argued that his first-degree murder convictions violated his due-process and equal-protection rights because his codefendants, Sykes and Tard, were found guilty on the lesser charge of second-degree murder. The trial-court judge was sympathetic to Tackett's argument, stating that "it is unjust and a miscarriage of justice that Defendant Tackett be convicted and sentenced for First Degree Murder while codefendants Tard and Sykes were subsequently convicted and sentenced for Second Degree Murder." *People v. Tackett*, No. 06-1194 FC, slip op. at 5 (Washtenaw Cty. Cir. Ct. Nov. 5, 2010). Nevertheless, the court denied Tackett's motion for relief from judgment because the trial-court judge did not believe that he had the power under state law to grant the requested relief. He instead urged appellate review to provide "further guidance" to trial judges operating under these circumstances. *Id.* at 7. Tackett then filed an application for leave to appeal the Michigan trial court's decision, but both the Michigan Court of Appeals and the Michigan Supreme Court denied his application.

In December 2012, Tackett filed his petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. After the State filed an answer to the petition, Tackett moved for a stay until Michigan's appellate courts could decide, in an unrelated case, whether trial courts may correct unjust convictions and grant relief from judgment under Michigan state law. The district court granted Tackett's motion for a stay. Several years later, in May 2016, Tackett moved for the stay to be lifted on the ground that the Michigan courts were unlikely to resolve the relevant issue in the near future. The district court granted his motion and reopened the case.

In its decision, the district court reviewed Tackett's habeas petition and rejected all of his claims on the merits. It did, however, determine that reasonable jurists could conclude that three of Tackett's claims—regarding the sufficiency of the evidence, the disparate verdicts, and whether Tackett received ineffective assistance of appellate counsel—deserved to proceed further. The court accordingly granted a Certificate of Appealability (COA) with respect to those claims.

Tackett proceeded by filing a notice of appeal and a motion in this court to expand the COA. This court granted the motion to the extent of expanding the COA to include Tackett's claim that the trial court erred by failing to instruct the jurors that they had to agree on a single theory of murder, and by allowing argument on certain portions of his ineffective-assistance-of-trial-counsel claim. These claims, along with those previously certified by the district court, are now before us.

## II. ANALYSIS

### A.      Standard of review

We review the district court's legal conclusions in habeas proceedings de novo and its findings of fact under the clear-error standard. *Braxton v. Gansheimer*, 561 F.3d 453, 457 (6th Cir. 2009). Federal courts may not provide relief on habeas claims that were previously adjudicated on the merits in state court unless the state-court adjudication either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  A state-court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in the Supreme Court's cases, or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from the Supreme Court's precedent." *Ayers v. Hall*, 900 F.3d 829, 835 (6th Cir. 2018) (brackets, citations, and internal quotation marks omitted).

## B.      Sufficiency of the evidence

Tackett's first claim is that there was insufficient evidence to support his first-degree murder convictions.  With regard to this claim, the Supreme Court has long held that the Due Process Clause protects any defendant "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  It has further elaborated that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction" is

> not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.  But this inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) (citations, footnotes, and internal quotation marks omitted) (emphases in original).

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, a federal court's "review of a state-court conviction for sufficiency of the evidence is very limited." *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018).  Sufficiency-of-the-evidence claims, in light of both *Jackson* and AEDPA, face a high bar in habeas proceedings because they are subject to two layers of deference:

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) (citations and internal quotation marks omitted).

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. In the case before us, Tackett was convicted of first-degree murder under Mich. Comp. Laws § 750.316, which proscribes, among other things, any "willful, deliberate, and premeditated killing." The elements of first-degree murder under this statute are "(1) the intentional killing of a human (2) with premeditation and deliberation." *People v. Bennett*, 802 N.W.2d 627, 633 (Mich. Ct. App. 2010).

An individual may be liable for murder either as a principal or as an aider or abettor. *Id.*; *see also* Mich. Comp. Laws § 767.39 ("Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense."). The elements of aiding and abetting are:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement.

*Bennett*, 802 N.W.2d at 633 (brackets, citations, and internal quotation marks omitted).

### 1.      *Whether some other person committed the crime*

At the outset, Tackett contends that he was not guilty of first-degree murder because the evidence did not show him to be one of the shooters responsible for the victims' deaths. The

evidence, he says, shows that Tackett was holding a handgun, whereas Copas and Tard were holding assault rifles. This is significant, according to Tackett, because bullets from the assault rifles were ultimately found responsible for the two victims' deaths, and the evidence showed that the only bullet found at the scene that could have come from a handgun was fired before the incident in question.

But even assuming that Tackett's gun misfired, the jury could still have reasonably concluded that Tackett was guilty of first-degree murder under an aiding-and-abetting theory. Based on Tackett's version of what happened, Copas and Tard fired the shots that ultimately killed the victims. The first part of the aiding-and-abetting analysis, therefore, asks whether Copas and Tard committed first-degree murder, which is to say whether they committed an intentional killing with premeditation and deliberation.

### a.      *Intent to kill*

Michigan law is clear that the intent element of first-degree murder requires more than "[m]ere conscious indifference to the likelihood of death." *People v. Milton*, 265 N.W.2d 397, 399 (Mich. Ct. App.), *judgment amended*, 282 N.W.2d 926 (Mich. 1978). "[T]o commit first-degree murder, a person must act with the purpose of causing death." *Id.* In other words, a "'very high risk of death' intent is insufficient for first-degree premeditated murder. The defendant must have an actual intent to kill." *People v. Dykhouse*, 345 N.W.2d 150, 152 (Mich. 1984).

Michigan's courts have also made clear, however, that the amount of evidence necessary to infer an intent to kill is not large. "It is well settled that the intent to kill may be inferred from any facts in evidence. Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill." *People v. Unger*, 749 N.W.2d 272, 286 (Mich. Ct. App. 2008) (citations omitted). A defendant's use of a lethal weapon, for example, will support an inference of such an intent. *People v. Ray*, 224 N.W.2d 735, 737 (Mich. Ct. App. 1974).

The case of *People v. Brown*, No. 305794, 2013 WL 5539284 (Mich. Ct. App. Oct. 8, 2013) (per curiam), encompasses facts that are strikingly similar to those in the present case.

*Brown* involved a first-degree murder conviction stemming from the 2004 death of Karibe Anderson, Jr., who was killed in a drive-by shooting. *Id.* at \*1. Anderson had the bad luck of staying at a particular house in Flint, Michigan at the time when the defendant wanted to carry out a drive-by shooting of the house next door because of a dispute that he was having with rival gang members who were known to meet there. Several of the gunshots entered the house that Anderson was staying at, and at least one of them killed him while he slept. After Brown was convicted of first-degree murder, he appealed, raising a sufficiency-of-the-evidence claim.

The Michigan Court of Appeals affirmed. It observed that there was evidence that the defendant "wanted to shoot up a house on Baltimore Street where members of the rival gang were known to congregate in retaliation for an earlier incident in which defendant was shot." *Id.* at \*8. Most notably, on the issue of intent to kill, the court wrote: "Evidence that defendant fired several shots into a house at a time when people were likely to be present and fired the shots 'below the windows,' i.e., at a height calculated to strike an occupant, was evidence of an intent to kill." *Id.*

*Brown* strongly supports the conclusion that the shooters possessed an intent to kill in the present case. In both cases, the defendant or defendants used lethal weapons, firing guns into a house or trailer from the outside, and in both instances the shooters were seeking to retaliate for previous incidents. Similarly, the shooting here took place at night, at approximately 11:30 p.m. That is a time when one would reasonably expect people to be in their dwellings; in other words, a "time when people were likely to be present." *See id.* The defendants in the present case also fired "below the windows," this being a height where individuals were likely to be hit, as evidenced by the fact that Bonar and Feldman actually were hit and killed. *See id.*

In short, virtually all of the facts that supported an inference of an intent to kill that were present in *Brown* are also present in this case. And a number of additional facts buttress the conclusion that Copas and Tard possessed an intent to kill. To begin with, they fired *assault rifles*, which are more powerful than ordinary firearms. They also shot the assault rifles into a trailer, as opposed to, for example, a larger house with thicker and sturdier walls. And perhaps most crucially, the evidence showed that at least some of the lights were on in the trailer at the time of the shooting, which would have indicated to the shooters that people were likely to be inside. From

all of these facts, the jury could have reasonably concluded that Copas and Tard possessed an intent to kill.

Tackett's theory of the case, on the other hand, is that the shooters did not possess an intent to kill because they merely intended to destroy property in order to avenge Ousley's damaging of Copas's van earlier in the day.  He relies heavily on the opinion of the trial-court judge who, in addressing Tackett's motion for relief from judgment, stated the judge's belief that the evidence showed at most that Tackett (along with his codefendants) was guilty of second-degree murder. The trial judge expressed the view that the defendants did not intend to murder Ousley or anyone else, and that they fired into the trailer without thinking about the consequences.  But the question before us is not whether this assessment is correct as an original matter.  Rather, it is whether *any* rational trier of fact could have agreed with the jury's conclusion.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  For the reasons stated above, the answer to that question is "yes," especially in light of AEDPA's requirement that, on habeas review, we are required to give an extra layer of deference to the state court's decision.  *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).

### b.    *Premeditation and deliberation*

The other two elements required for first-degree murder in Michigan are premeditation and deliberation.  These are distinct elements; the Michigan courts have distinguished them by stating that "[t]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Oros*, 917 N.W.2d 559, 565 (Mich. 2018) (citation and internal quotation marks omitted).  Although the two elements are distinct, "a rigid and mechanical application is often difficult because the same facts may tend to establish each element." *Id.*  As with intent to kill, an inference of premeditation and deliberation may be established from all of the facts of the case.  *Id.*

One way in which premeditation and deliberation may be established is through "an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.'" *Id.* at 566 (citations omitted).  The amount of time deemed necessary for a "second look" to take place has

never been precisely determined, but the Michigan Supreme Court has noted that "premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds.'" *Id.* (citations omitted).

In the present case, there was more than enough time for the shooters to take a "second look." The time interval during which Tackett, Copas, and Tard traveled to Ousley's trailer after getting the guns was significantly longer than the "matter of seconds" required for a "second look" to take place. Moreover, the record provides evidence that premeditation and deliberation actually took place during that time. The group retrieved the guns and drove from one place to another for the specific purpose of shooting up Ousley's trailer. And once at the trailer park, they waited for a patrol car to leave the area immediately prior to the shooting. The fact that the defendants all put on gloves or socks in order to hide their fingerprints further supports an inference that the defendants were engaging in forethought regarding what they were about to do. In short, there is ample evidence in the record for the jury to have reasonably concluded that the elements of premeditation and deliberation were established.

### 2.      *Assisting in the commission of the crime*

Two remaining elements must be shown to establish Tackett's aiding-and-abetting liability for first-degree murder. They are: (1) that Tackett "performed acts or gave encouragement that assisted the commission of the crime," and (2) that he "intended the commission of the crime or had knowledge that the principal intended its commission at the time that [he] gave aid and encouragement." *See People v. Bennett*, 802 N.W.2d 627, 633 (Mich. Ct. App. 2010) (citations and internal quotation marks omitted).

With respect to the "acts or . . . encouragement" element, aiding and abetting "describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime." *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999) (citation and internal quotation marks omitted). Tackett took several actions that meet this standard. He joined Copas and Tard knowing that they had been involved in the first altercation earlier in the day, and the group collectively armed themselves with guns, including assault rifles. Tackett also put on gloves and provided gloves or socks to the

others, presumably to hide their fingerprints.  At the very least, he then attempted to shoot a handgun during the time that Copas and Tard were firing assault rifles into the trailer.  And later, after the shooting, Tackett attempted to hide the assault rifles in his father's garage.  The jury could have reasonably concluded from all of these actions that Tackett provided assistance to Copas and Tard that supported their commission of the crime.

### 3.      *Intent or knowledge of the commission of the crime*

As for the "intent" element, an "aider and abettor's state of mind may be inferred from all the facts and circumstances."  *Id.* (citation and internal quotation marks omitted).  An analysis regarding Tackett's state of mind closely mirrors the intent inquiry for Copas and Tard.  In other words, at the time that Tackett assisted Copas and Tard, he was witnessing all of the same facts and circumstances that they were.  He knew, for example, that Copas and Tard were about to fire assault rifles into a trailer known by all of the members of the group to serve as a habitation. Tackett would also have known that the events were taking place at a time when people were likely to be inside, and he would have known that Ousley had been present there earlier in the day.  And finally, Tackett would have seen that at least some of the lights were on in the trailer at the time of the shooting.  The jury could have reasonably concluded, based on all of these facts, that Tackett either intended the commission of first-degree murder or knew that Copas and Tard intended to commit first-degree murder.  Because the jury could have reasonably determined that all of the elements of first-degree murder were satisfied under an aiding-and-abetting theory, we reject Tackett's sufficiency-of-the-evidence claim.

## C.      Unanimity instruction

Tackett's second claim challenges the general instruction given to the jury by the state trial court that the jury's verdict had to be unanimous.  Tackett argues that this instruction was insufficient.  Specifically, he observes that he could have been convicted under two distinct legal theories:  (1) as a principal, or (2) as an aider and abettor.  He contends that the trial court erred by failing to give the jury a special unanimity instruction to the effect that the jurors had to unanimously agree as to which of these two theories was serving as the basis for their verdict.

We reject this argument for two separate reasons. First, as the State argues, and as the Michigan Court of Appeals found, Tackett waived this claim by affirmatively approving of the trial court's jury instructions. *Copas*, 2008 WL 4149002, at \*10. A defendant waives any alleged errors with respect to jury instructions by acknowledging to the trial court that he has no objections to the instructions as given. *People v. Ortiz*, 642 N.W.2d 417, 425 (Mich. Ct. App. 2001). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v. Carter*, 612 N.W.2d 144, 149 (Mich. 2000) (citation and internal quotation marks omitted). Tackett does not offer any response to the State's waiver argument. Because Tackett affirmatively approved of the jury instructions, he has waived this claim.

Second, Tackett's unanimity claim is unpersuasive on the merits. There is no general legal requirement that jurors must unanimously agree on a theory of guilt. "[I]t is acceptable for a first-degree murder conviction to be based on two alternative theories even if there is no basis to conclude which one (if only one) the jury used." *Coe v. Bell*, 161 F.3d 320, 348 (6th Cir. 1998) (citing *Schad v. Arizona*, 501 U.S. 624, 636–37 (1991)). In our circuit, a "specific unanimity instruction is required only when one of three situations exists: 1) the nature of the evidence is exceptionally complex; 2) there is a variance between indictment and proof at trial; or 3) there is a tangible indication of jury confusion, as when the jury has asked questions of the court." *United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997). Nothing in the record suggests that any of these scenarios apply to the present case.

Nor has Tackett cited any authority suggesting that the state trial court's jury instructions ran counter to clearly established federal law. Indeed, he seems to concede in his reply brief that "a unanimous verdict may not have been required," although it "should have been requested under the facts and circumstances of this case." He is accordingly not entitled to relief on his jury-instructions claim.

## D.    Inconsistent verdicts

Tackett's next claim stems from the disparate results of his case as compared to those of his codefendants Sykes and Tard. The prosecutions of Sykes and Tard, Tackett says, "arose from

the same set of facts and under the same legal theory of criminal liability" as did his case.  Yet Tackett was convicted of first-degree murder, whereas Sykes and Tard were convicted of second-degree murder.  Tackett argues that this outcome violated his rights under the Due Process Clause and the Equal Protection Clause.  He draws on the trial-court judge's opinion that the disparity between the results reached among the various defendants constitutes an injustice.

The problem for Tackett is that there is no authority to support the legal proposition that underlies his claim.  Rather, the Supreme Court has held that inconsistent verdicts do not present a constitutional problem.  *See, e.g.*, *Harris v. Rivera*, 454 U.S. 339, 345 (1981) ("Inconsistency in a verdict is not a sufficient reason for setting it aside.").  Indeed, the Court has gone so far as to hold that a defendant accused of aiding and abetting in the commission of an offense may be convicted even if the named principal has been *acquitted* of the same offense.  *Standefer v. United States*, 447 U.S. 10, 11, 25–26 (1980).  If Tackett could have been convicted of first-degree murder under an aiding-and-abetting theory even if Sykes and Tard had been acquitted altogether, surely the same result is legally unassailable where, as here, Sykes and Tard were convicted of second-degree murder.

The cases that Tackett cites fall well short of establishing that he has a due-process or equal-protection right to a verdict that is consistent with those of his codefendants.  First, Tackett cites *Griffith v. Kentucky*, 479 U.S. 314 (1987), for its language that there is a "principle of treating similarly situated defendants the same." *Id.* at 323.  *Griffith*, however, dealt with a totally different legal issue from the one presently before us—namely, the retrospective application of the Supreme Court's previous decision in *Batson v. Kentucky*, 476 U.S. 79 (1986).  The *Griffith* Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."  479 U.S. at 328.  Its language regarding "similarly situated defendants" was used to support the Court's rejection of a "clear break" exception to the principles governing the retroactivity of new rules of criminal procedure.  *See id.* at 327–28.  *Griffith* simply had nothing to do with the equal treatment of defendants in terms of what verdicts can permissibly be reached in evaluating a given factual situation.

Tackett next cites the Ninth Circuit's decision in *Walter v. United States*, 969 F.2d 814 (9th Cir. 1992). The *Walter* court quoted the same language referenced above from *Griffith*, adding that the principle described in *Griffith* "requir[es] particularly strong adherence when the two cases are not merely factually alike or even factually identical, but arise from *the same facts*." *Id.* at 817 (emphasis in original). In *Walter*, however, the relevant disparity was that the court had previously rejected Walter's Speedy Trial Act claim but agreed with the same claims of his codefendants under identical facts. *See id.* at 815. The *Walter* court invoked the principle from *Griffith* to allow Walter to correct this disparity through a collateral attack. *See id.* at 816–18. But, as in *Griffith*, the case did not involve any inconsistency in jury verdicts. Even leaving aside the fact that *Walter* is from another circuit and thus not binding on us, it is of no help to Tackett.

Finally, Tackett cites this court's unpublished table opinion in *Bunker v. Jabe*, 995 F.2d 1066, 1993 WL 206533 (6th Cir. 1993). This court had previously determined, in examining the conviction of Bunker's codefendant, that the instructions given to the jury in the two defendants' joint trial "unconstitutionally shifted the burden of proof regarding intent to commit murder." *Id.* at *1. The *Bunker* court applied the same analysis to the jury instructions with respect to Bunker. *Id.* at *1–2. Once again, even leaving aside the fact that *Bunker* is not a precedential decision, the case does nothing to establish any right to parity in jury verdicts. The State therefore prevails on this claim.

**E.     Ineffective assistance of trial counsel**

Tackett's final two sets of arguments revolve around the performance of both his trial counsel and his appellate counsel on direct appeal. He contends that, for various reasons, each of these attorneys' acts and omissions violated his Sixth Amendment right to the effective assistance of counsel.

The Supreme Court, in *Strickland v. Washington*, 466 U.S. 668 (1984), set out a two-prong test for determining when a counsel's assistance is so deficient that it requires a conviction to be set aside:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. "Whether counsel's performance was 'deficient' under the first prong is determined by reference to 'an objective standard of reasonableness'—specifically, 'reasonableness under prevailing professional norms.'" *Hendrix v. Palmer*, 893 F.3d 906, 921 (6th Cir. 2018) (quoting *Strickland*, 466 U.S. at 688). The second prong of the test requires that the defendant must affirmatively prove prejudice, meaning that his counsel's errors "must have 'actually had an adverse effect on [his] defense.'" *Id.* (quoting *Strickland*, 466 U.S. at 693).

This standard is even more difficult to meet in habeas cases, where the review that applies to *Strickland* claims is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "The question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). For a state court's adjudication of a *Strickland* claim to be "unreasonable" under 28 U.S.C. § 2254(d)(1), it "must have been 'so lacking in justification' that it amounts to 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Hendrix*, 893 F.3d at 922 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

### 1.    *Failure to recall and impeach Ousley*

Tackett's first contention with respect to his trial counsel is that such counsel was ineffective for failing to recall and impeach Ousley. Ousley had been a witness for the prosecution on the second day of the trial. "On the morning of the third day of trial, the prosecutor informed the trial court and the defense attorneys that, after testifying, Ousley was arrested and charged on an unrelated criminal sexual conduct warrant." *Copas*, 2008 WL 4149002, at *3. Tackett alleges that Ousley "is a child rapist, a thief, and a drug addict," and that these matters should have been brought to the attention of the jury.

Although Tackett did not present this claim on direct appeal, his codefendant Copas made a similar argument. The Michigan Court of Appeals rejected it with the following explanation:

> Defendant Copas has not established any support for his claim that Ousley was aware of the unrelated warrant before he testified in this case, let alone that there was any arrangement whereby Ousley would receive leniency in that case in exchange for his testimony in this case. The mere fact that Ousley's preliminary examination may have differed in some respects from his trial testimony does not support such an inference. Rather, the inconsistencies presented defense counsel with an opportunity to impeach Ousley, which he did. Defendant has failed to show that defense counsel's performance with respect to Ousley fell below an objective standard of reasonableness.
>
> In addition, the principal evidence implicating defendants Copas and Tackett at trial came from two eyewitnesses who were in the van with the defendants during the shooting. Because Ousley did not provide the critical evidence implicating defendant Copas, there is no reasonable probability that further impeachment of Ousley would have changed the jury's verdict.

*Id.*

Tackett has provided no reason for us to conclude that this determination was unreasonable, or that the Michigan Court of Appeals's analysis of this claim with respect to him would have been any different than it was with respect to Copas. He argues that the outcome of the trial might have been different if the jury had known about Ousley's charges and other relevant characteristics when assessing Ousley's credibility "as to how many gunshots and how many guns he heard during the assault." But as the district court points out, Ousley testified that he did not see Tackett during the incident. Ousley also said that he might have heard two guns firing, based on the speed of the shots, but that he had difficulty telling for sure and that he did not see the people doing the shooting. This information was not so damaging to Tackett as to demonstrate that there is a reasonable probability that further impeachment of Ousley would have changed the jury's verdict.

In addition, Tackett's argument falls short on the first prong of *Strickland*. A trial counsel's "tactical decisions are particularly difficult to attack," meaning that a defendant "attacking his lawyer's performance must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted).

Impeachment strategy falls within this category of trial tactics. *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002). Tackett cites no authority regarding what qualifies as a deficient level of performance in this context. He has thus failed to demonstrate that the decision to forego recalling and impeaching Ousley was such a serious error as to signify that his "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. For these reasons, we find no merit in Tackett's "recall" claim.

### 2.    *Failure to object to the jury instructions*

Tackett next argues that his trial counsel was ineffective for failing to object to the jury-unanimity instructions, which are discussed in Part II.C. above. He spends only two sentences on this claim and does no analysis other than to refer back to his earlier substantive discussion of the jury instructions.

Tackett's legal claim that the trial court erred by failing to instruct the jurors that they had to unanimously agree as to which theory of guilt was serving as the basis for their verdict is meritless. The failure to raise a meritless claim does not constitute ineffective assistance of counsel. *See, e.g.*, *Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Because the underlying legal claim lacks merit, the failure of Tackett's trial counsel to raise that claim does not constitute ineffective assistance of counsel.

### 3.    *Failure to move for an adjournment*

We now turn to Tackett's ineffective-assistance-of-counsel claim with regard to his expert witness. At trial, the defense called Steven Howard as an expert witness in ballistics. Howard testified that the one bullet found in the trailer that could have been fired from a handgun was oxidized, meaning that it had to have been fired well before the night in question. On cross-examination, the prosecution challenged Howard on this claim, asking how he could know that the bullet was oxidized without a chemical analysis. Howard responded that he was not given time to conduct such an inquiry. Tackett contends that his trial counsel should have moved for an adjournment at this point to allow time for testing to take place.

But as the district court noted, the lack of testing on the bullet did not stop Tackett from establishing his defense on this point at trial. Howard's opinion that the bullet was fired during a previous incident was not stricken. In addition, the prosecution's expert witness conceded that a white substance found on the bullet might have been the result of oxidation.

There is also no reason to believe that a motion for an adjournment would have been granted. The trial judge had warned the parties before trial that he "was not going to have a last minute adjournment as a result of failed discovery." A motion for an adjournment must be based on good cause. Mich. Ct. R. 2.503(B)(1); *People v. Jackson*, 650 N.W.2d 665, 668 (Mich. 2002) (per curiam) (citing Mich. Ct. R. 2.503). When such a motion is made on the grounds of unavailability of evidence, it will be granted "only if the court finds that the evidence is material and that diligent efforts have been made to produce the witness or evidence." Mich. Ct. R. 2.503(C)(2). Whether the trial judge would have found the evidence material is questionable, and Tackett has provided no information regarding the efforts made to test the bullet. In short, there is no reason to conclude either that Tackett's trial counsel was deficient in failing to move for an adjournment or that Tackett was prejudiced by that failure.

### 4.      *Failure to impeach two prosecution witnesses*

Tackett's final argument regarding his trial counsel's alleged deficiency is that the attorney was ineffective for choosing not to impeach two of the prosecution's eyewitnesses—Richard Steglich and Pete Wisniewski. During a preliminary examination, both witnesses admitted to using drugs and alcohol at the time of the incident in question. Tackett contends that his counsel's failure to question these witnesses at trial about their use of drugs and alcohol and the influence of those substances on their ability to recall events constitutes ineffective assistance of counsel.

Steglich lived on the same street as Ousley, about four trailers down, and Wisniewski was staying with Steglich on the day in question. In general terms, Steglich testified that he had witnessed a brown van initially drive up to Ousley's trailer and then speed away after the initial confrontation. He also recounted that the same van had come back late at night, had pulled up in front of Ousley's trailer, and that the people in the van started shooting toward the trailer.

Wisniewski, who was present with Steglich at the time, also provided a similar account of the two incidents.

The problem with Tackett's claim is that he does not provide any reason to conclude that the testimony of these two witnesses was damaging to his case. One of them, Wisniewski, even admitted at trial that he had been drunk and could not remember much from that day. More importantly, as Tackett himself points out in his brief, both Steglich and Wisniewski testified that they had never seen Tackett before, and that neither could identify him as a rider in the brown van.

Tackett needs to show that his counsel's alleged errors prejudiced him, meaning that they "actually had an adverse effect on [his] defense," in order to prevail on this issue. *See Hendrix v. Palmer*, 893 F.3d 906, 921 (6th Cir. 2018) (quoting *Strickland*, 466 U.S. at 693). Even assuming that his counsel erred by not impeaching Steglich and Wisniewski, Tackett has not shown that he was prejudiced by this decision. Indeed, he does not even present a theory as to what testimony from these two witnesses had any meaningful effect on the ultimate verdict. He is therefore not entitled to habeas relief on this claim.

**F.     Ineffective assistance of appellate counsel**

This leaves us with Tackett's claims regarding his appellate counsel. He makes two main assertions to support the conclusion that his appellate counsel was ineffective. First, he argues that his appellate counsel was ineffective for failing to raise the four ineffective-assistance-of-trial-counsel claims previously mentioned. But, as discussed in Part II.E. above, all of those claims lack merit. Because of the well-established principle that "appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit," *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001), Tackett's appellate counsel was not ineffective for failure to raise them.

Second, Tackett argues that his appellate counsel was deficient for failure to submit the transcripts of the "degree hearings" of his codefendants Sykes and Tard for the purposes of making his sufficiency-of-the-evidence claim. He maintains that his appellate counsel did not request those transcripts in a timely manner. Tackett also contends that "[t]here was no downside to arguing that the convictions violated due process and equal protection of the laws, as it appears

that counsel attempted to frame his sufficiency" claim. The point seems to be that the sufficiency claim would have been stronger if reinforced by the argument based on due-process and equal-protection principles regarding the disparity between Tackett's convictions and those of Sykes and Tard.

This contention, however, is without merit. The disparity argument would not have helped Tackett no matter how effectively it was presented. As discussed above, there is simply no constitutional right (whether grounded in due process or equal protection) for a defendant to receive a verdict that is consistent with those of his codefendants. Nor has Tackett provided any reason to conclude that the disparity argument would have bolstered his sufficiency-of-the-evidence claim, where the relevant question is simply whether there was sufficient evidence to support his conviction. Again, appellate counsel cannot be ineffective for failing to raise a claim that lacks merit. We conclude, accordingly, that Tackett has not met the requirements for habeas relief on his ineffective-assistance-of-appellate-counsel claim.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.